May I please the Court? With the Court's permission, I'd like to reserve five minutes for rebuttal time. The parties agree that the primary markets for the telephone systems at issue are intensely competitive, with Avaya facing rivals like Cisco, Microsoft, and Siemens. Avaya has a business model that is common in the industry and entirely legal that requires buyers of its equipment either to obtain maintenance from Avaya or one of its business partners, or to perform their own maintenance. Our briefs explain the multiple errors that occurred in the proceedings below. Among other things, the District Court was wrong to take from the jury Avaya's contract and tort claims for TLIs hacking and fraudulently obtaining access to Avaya's maintenance software. And do I understand you correctly, Mr. Waxman, to be also arguing that independent of any errors you think occurred in the antitrust instructions given to the jury, the decision to grant judgment as a matter of law on the common law claims ended up infecting the way the jury considered the antitrust counterclaims. Is that correct? Yes, Judge Jordan. That is also our position for the reasons we've stated in our blue and yellow briefs. Okay. Focusing just on the antitrust part for a moment. Sure. Thank you. I'm wondering if you can – one thing that's sort of been going back and forth in my own mind about is whether in this unusual little corner of antitrust law where we still have per se liability, although Judge Aldister a long time ago from this court noted that that's a little bit of a bad joke because there's so many exceptions. The requirement that there be some kind of predatory action in addition to tying to make out a claim of the sort that was at issue in Kodak and is at issue here almost seems redundant. Isn't the tying behavior itself, particularly as it's alleged here, predatory? Well, we don't think that the tying behavior here or for that matter the attempted monopolization behavior here is predatory, and we think we're entitled to judgment both on the attempted monopolization of the PBX maintenance and the tying with respect to the PBS patches. Let's focus – I don't want to get bogged up with the two, so let's stick with PBX for a moment. Okay, sure. Okay. I'm not asking you to admit anything about the facts of this case. Divorce it from this case. Theoretically, you've got a case a lot like this. What do you get? What's the extra thing you would need if what's already being asserted is there's an aftermarket, and in that aftermarket there's behavior where people are erecting barriers to third parties participating? Right. So whether – first of all, both of these claims were tried under the rule of reason, but whether it was a rule of reason or a per se case, the counterclaimant was required affirmatively to prove both that there was anticompetitive conduct, that is, conduct that rises to the level of a violation of the Sherman Act, and that there was a relevant aftermarket. And with respect to the PBX claims, we're entitled to judgment on both of those. First of all, the PBX verdict has to be reversed because both of TLI's primary theories of anticompetitive conduct, that is, an unlawful refusal to deal and so-called FUD letters that rise to the level of a Sherman Act violation, fail as a matter of law. And in any event, even if that weren't true, there was no – as a matter of law, there was no relevant antitrust aftermarket or PBX maintenance after May 2008 when even TLI's CEO concedes that Avaya began stating its maintenance policy in its customer contracts. Okay, so if we said that that were true and that you couldn't then tease out what the damage is or the result of that was, then you're all likely to be right. It would have to go back, but you'd still have to try the pre-2008 behavior, right? That's right. We think that the appropriate – well, only if we're wrong on the failure to prove anticompetitive conduct. Then we would be entitled to judgment for conduct on contracts after May 2008 and a new trial on contracts signed before May 2008 in front of a – before a properly instructed jury. Theoretically, could you have an instance where you would find, as you suggest, on the post-2008 and yet affirm on the pre-2008? You can't because the jury was not properly instructed on what is required to find a relevant antitrust aftermarket or, to put it another way, to prove market power in the maintenance aftermarket. And that's your focus on the May-Must distinction? Yes. I mean, the error in the aftermarket instructions was that the judge listed five factors or five considerations that were mentioned in Kodak, and this court also articulated it Harris and Ayer, and over our objection told the jury that it could give, you know, however much weight it wanted to any of those factors without instructing the jury, as the law requires, that even if you establish lock-in, one of the factors, so long as customers in the primary market either understood that software would not be available if the customer used an unauthorized independent service provider, or that buyers in the primary market had no reason to think that they could obtain Avaya's proprietary software in conjunction with use of an unauthorized independent service provider, you don't have a relevant antitrust aftermarket under Queen City PISA. Well, wouldn't that speak to then making it mandatory with regard to absence of knowledge but not the other factors? Well, I don't usually think about it as mandatory, so my hesitation is just making sure that we're saying the same thing. We ask that the jury be instructed, and we think that the law of this circuit and five other circuits requires that a jury be told that if the customers in the primary market understood that they would not be able to get Avaya software if they were using an unauthorized service provider, then by definition, the primary market is disciplining pricing in the aftermarkets, and there is no relevant antitrust aftermarket. And we were entitled to have the jury told that. What case has ever held that advance notice immunizes the restriction from antitrust challenge? Just because in Queen City the franchising had notice, I don't read that case or any other case to say that as long as you can show that the customer had advance notice, it's immunized. Well, I would very much like to be able to point the court to a sentence in Queen City in which the court said this is dispositive, but it was the court's holding the significance that the court placed on the fact that the Pizza Hut franchisees had contractual notice was this court's reputation of the contention that Kodak required a different result. But I want to make clear, not only have at least five other circuits held that even if you have lock-in, if customers in the primary market understand what the secondary market policy is, there is no relevant aftermarket. That was the point of Justice Scalia's dissent, or one of the points of Justice Scalia's dissent in Kodak, right? Right. But it was a dissent. That's right. He made that point, but he didn't win the day. Well, that's because in Kodak, Kodak was asking the court and prevailed below on a theory that if you have competition in the primary market, then by definition you can never have an independent aftermarket or monopoly power in the aftermarket. And what the Supreme Court said is, no, no, no, that's not necessarily true because you could have, and in fact the evidence in that case tended to show, that people who bought Kodak equipment didn't understand that they wouldn't be able to get parts if they used an independent service provider. And in fact, as the Supreme Court said in Kodak, the evidence showed that Kodak changed its policy after selling this equipment to in fact preclude, to prohibit sales of the parts. And the way that this court in Queen City distinguished Kodak, I understand that there were other reasons for finding no antitrust market, but in a valid response to the argument that Kodak required the finding of a market in this case, this court said that no, the franchisees understood at the time that they signed the franchise agreement, that there would be these contractual limitations, and in Harrison Air, where also we don't have a crisp holding of this court, this court said the record is clear that Harrison Air got exactly the balloon and the aftermarket fabric that it bargained for. And many other circuits have cited this court's decisions, particularly Queen City Pizza, for the proposition that if you have a contract in the primary market that says, here's the aftermarket policy, that as a matter of law eliminates a showing of a relevant antitrust action. The facts don't matter. What am I missing here? I read Queen City to say that if you want the Domino's franchise, and they tell you up front that to get it, you have to buy their cheese and their sauce, etc., you've been put on notice about the aftermarket. Harrison Air says that if you want to buy the balloon, you've got to buy their fabric, and if the fabric fails, you're stuck with them, right? But that's quite counterfactual to what occurred here. The record is replete with evidence put before the jury that Avaya put the independent service providers into business, hired them, they hired many former Avaya employees, many of whom were paid some money by Avaya. They were encouraged to pursue this business, and then once Linda Shoemaker learned that Terry Carafa had offered this deal, this special deal to TLI, Avaya does a 180 and shuts the whole thing down. The facts in this case seem strikingly different from the facts in Harrison Air and Queen City, are they not? So Judge Hardiman, I think it's important for purposes of PBX, and I would like to say a few things about the PDS interest claim too, but I think it's important to distinguish between the period of contracts signed before May 2008 and contracts signed after, as the trial judge did in granting an injunction as to the earlier period but not the later period. But that sounds like you're a concession pre-08. I may be on much stronger footing after 08. Let me be very clear about this. Our position is as follows. As a matter of law, we are entitled to judgment for all contracts signed after 2008, and because the court declined our request that the jury make findings that distinguish between the two periods, we are entitled to a new trial even as to the prior period. But as to the prior period and the evidence that you're reflecting, our contention is, and our brief outlines this, the evidence was very, very substantial, very substantial, but I'm not asking for judgment as a matter of law, that customers that bought Avaya equipment in the primary market before May 2008 had no expectation that they could use an independent service provider. That's for a properly instructed jury to evaluate, and as to your point... Hold on, Mr. Waxman. I've got to interrupt you to ask. When you say there was no basis for that, Avaya chose to segment the market. If I understand the record correctly, they offered pre-08, going back to the early days, 02, 03, you could buy the most expensive level of service, which was from Avaya. You could buy service, the Dabman service, from their business partners, or you could, in effect, self-insure, buy your MSP and your, the other code, the OC, what is it? ODMC. Yeah, that one. You could buy these on demand and the other packet that would get you in, and you log in, and you would take, quote, you'd maybe take care of yourself. But as soon as you create a market where you say you can self-serve, haven't you created a market, an aftermarket, which implies you can have other people help you with your self-service? Judge Jordan, you're absolutely correct that Avaya offered customers three options. They could get full, gold-plated Avaya maintenance. They could get a lower level of maintenance from business partners who, Judge Hardiman, are not rivals. They are not independent. They are partners with Avaya. Who are the companies that quickly became rivals? Well, there was one company that decided to cannibalize Avaya's business, and that business partner relationship was terminated, and they became a rival. They were no longer cooperating with or being supervised. How does $12 to $16 million out of a billion constitute cannibalization? I'm not sure what numbers you're talking about. Shoemaker sends us this memo that says, hey, you know, we stand to lose $12 to $16 million in maintenance business to TLI. But the space is a billion dollars of business. So less than 1% just doesn't strike me as cannibalization. Judge Hardiman, I was responding to your suggestion that there – and I gather this goes to the question of whether there was an unlawful refusal to deal for purposes of establishing some actionable anti-competitive conduct. Avaya never, ever, ever dealt directly with unauthorized service providers. It never provided ODNCs to unauthorized service providers. It had a business model under which both – I'm going to accept that, and I'm going to bring you back to my question, which I don't have an answer to yet. And since we're out of time, I want to get an answer to it, Mr. Waxman, if I can. Did your client not create the aftermarket, at least running up to 2008, by creating the so-called maintenance assist program where people could have their own access, which a reasonable person could think that doesn't mean I have to do it all by myself. If I can find a contractor to help me do it, I can do that. Right, and our answer, so that we're very clear about this, is we think that a properly instructed jury would find the answer to that question to be no, because the – and again, I'll refer the court to the portions of our brief that discuss the terms of the consumer sales contracts. The consumer sales contracts, even before 2008, provided customers with a right to use software furnished under this agreement, and the ODNCs were not. And that was only with a separate licensing contract called maintenance assist. At least a question for a jury, is it not? It is very much a question for the jury. And I think what's most revelatory here is that when TOI was terminated in 2003, they sued Avaya, and they alleged that Avaya was refusing to make available, that Avaya would not make available to its customers its proprietary ODNCs if they used an ISP. And Judge Shatter in the Northern District of Illinois in 2006 also found that that policy was well-known and understood before the 2008 contract. All right, thanks. Now, I know I'm out. You're not out. We're good. Yeah, I got it. Okay. I did want to say just a few things about actually, I'm out. No, you're out of you initiating something. Okay. Hey, lifetime tenure, I love it. Now you're back in. Right. So I wanted to ask you about two things, pre-judgment interest in the first instance, and then let's start with 7.3, okay? 7.3, you mean of the contract in the Avaya 1 contract? Yeah, yeah. Sure, okay. So I just have a very rudimentary question. What's the specific conduct that you alleged they breached on 7.3? Was it the remote enabling? What specifically? They were enabling, quote, features or capabilities with the, quote, capacity of being remotely enabled. That is, they were, through hacking and cracking and submitting fraudulent D admin forms, they were gaining remote access to the OEMCs that were activated only through these fraudulent means, and that is a, we think a jury could certainly have found that that is a violation of their contract with us, an obligation that survived the termination of the contract. So then what is it about the MST that makes it a feature? You know, there's the whole question about the definition of feature, and, you know, you don't like antiviruses and HP4, and I'm not getting, with regard to the MST, what makes that a feature? You mean the OEMCs? That is, the software that was turned on through the MST addendum or maintenance assist. I mean, I don't think I can do better than we tried to do in our blue brief in looking at, I mean, I would think that it is both a feature or a capability. That software is a feature of the system that is provided. The feature specifically is the capability remotely to maintain the system. I mean, I think in any vernacular sense of the word, it is both a feature and a feature that provides a capability, but our only submission to the court is that the trial judge had no business and no authority taking these questions of contract interpretation and, for that matter, a course of fraudulent conduct from the jury. We were entitled to have these contract interpretive questions on our affirmative claims tried to a finder of fact and, with respect to the tort claims, a finder of the relevant standards of morality under New Jersey tort law. I guess I can't say anything else unless you ask me a question. That's a good approach right now. Actually, we probably should have given both sides a half hour on this at least, so we'll assure the other side that you'll get another ten minutes because I've got a couple more questions for you too. I was following up on an earlier theoretical question about the post-2008 market. You've said in your briefing you've asserted here in factly today that you think that as long as they're on notice, that as a matter of law means there can't be an antitrust aftermarket, right? That's the position you've taken, in fact. Yes. I'm wondering if the way Harrison Ayer is phrased, Harrison Ayer talks in terms of a post-sale change blocking people in, but is the assertion that it's an absolute bar to liability, notice is an absolute bar, accurate, or does the case law indicate that maybe that's an evidentiary hurdle that somebody ought to have to meet, but you could still have a market with high switching costs, with high information costs, where there could still be liability? I probably asked that poorly, Mr. Waxman. No, no, no. I understand what you're asking. I want to say that there are three of what Harrison Ayer called factors that are implicated by the rule of law that we think is required. One is, is there a lock-in? If there's no lock-in, that is, if the customer in the secondary market could just as easily get rid of the primary equipment, then by definition there's no market power in a relevant aftermarket. But even if you have lock-in, there's the issue of information costs, that is, could a reasonable, what this court has called a reasonably diligent customer, understand the policy? And second of all, was there a post-primary market purchase change, as there was in Kodak? And our submission is, and I think we cited the court to the other circuits that have cited this court, its authority to the point that even where you have lock-in, if there was, as there was in this case, no post-sale price change or policy change, at least after May 2008, by definition. That's the question. See, that's the problem because it assumes that the 2008 contract was so clear that no reasonable customer could have misunderstood it, right? I mean, the assertion is that you were on notice. Why? Because our contractual language in May 2008 going forward was absolutely clear. But if there's some question about that, the clarity of the notice that was given in May 2008, then aren't you in a posture where that's something that the jury ought to be taking account of? Were these people on notice? Was the reasonable customer so thoroughly on notice that they should have understood? In short, is your argument for judgment as a matter of law for the post-May 2008 sales misplaced because there's a question about the notice you gave? So I agree with you, Judge Jordan, that if the evidence permitted a reasonable juror to find that reasonably diligent buyers could not ascertain the policy barring independent service providers from using our software commands, then all we'd be entitled to on PBX would be a new trial as to the whole period. Our submission here is that there was no evidence. In fact, there were admissions that as of May 2008, the language of the May 2008 contract made it so that you could not find that any reasonable buyer could do it. TLI's own CEO testified under oath that the meaning of that language was that you could not get access to a buyer's proprietary software, and so it's a sufficiency argument. I got you. Thanks very much. As is our argument with respect to PBX. All right. Thanks. We'll have you back on the ball, sir. Okay. Thank you. I appreciate it. Mr. Martin. Thank you. Your Honors, with the Court's permission, may it please the Court, James Martin, for the appellees and cross-appellant. I wonder if I might go straight to the 2008 contract issue to give the Court our perspective on that as it stacks up on the record here. I'm pretty sure you disagree with Mr. Martin. We do in almost every particular, starting with whether the argument can be made. The instructional error that's being urged on appeal in support of the 2008 contract is not the argument that Avaya made in the trial court. It's a very different argument. The instruction offered in the trial court that related to 2008 was that all the five factors had to be proven in a must fashion. The instructional error that they're urging in their briefing on appeal is different. But even if we get by the waiver point, Your Honors, as was touched on in the discussion, there is no support in the case law for the notion that the presence of notice in 2008 would be, in effect, an immunity that disposes of the rest of the analysis of the Kodak factors that produce the indicia of an aftermarket. Really? So it's a holistic, as I understand the difference of opinion between yourself and Mr. Waxman, you're arguing for a holistic review by the jury of the factors. And they're arguing that there are certain factors that are dispositive. Yes. Is that your understanding? I think from 30,000 feet, that's where the parties first separate. But how can it be the case, as a matter of economic theory, that if you have clearly, unequivocally put your buyers on notice, and this is a sophisticated market. These aren't people bumbling off the street deciding whether to buy gum or not. These are large purchases made by large, sophisticated entities, businesses, and government, right? So if you've got clear notice to sophisticated parties that you buy our equipment, you're buying our service, too. And you're buying the software patches or upgrades. These are coming from us and only from us. In other words, if you've got that upfront bundling, and everybody knows it, isn't the import of Queen City and Harrison Air, if not the explicit holding, that you've got an extraordinary hurdle to overcome because you haven't been able to dissociate the primary and the aftermarket? So let me approach that in two ways. First of all, it's not the holding of either Queen City or Harrison Air, and it's not the implication of either Queen City or Harrison Air. Starting with Harrison Air, hold just a moment. What does Queen City mean if it doesn't mean, hey, you could buy any franchise you want? There's lots of them out there. Domino's is not the only pizza franchise available to you. You know you're going to be buying Domino's dough if you buy a Domino's franchise. So don't come crying to us. What is it about Queen City that you think would support the notion that that kind of clear notice doesn't cut you off? So first of all, the notice in Queen City was in the primary market. We're talking here about issues that relate to the aftermarket. Second, Queen City, the analysis was in light of all the addition in Kodak. Hold on just a second so that we're on the same page. I want to keep us on post-May 2008, right? So we're in the primary market as I understand it, right, for that period, because this is supposedly telling people as they're considering the purchase in the primary market, correct? Correct. Okay. So how many PBXs were sold after that period? The vast majority of the PBXs in this case were installed and sold before 2008. So there's a whole basis to affirm this verdict on the pre-2008 conduct as a matter of fact and as a matter of law under this court's presumptions. But moving straight to Queen City, Queen City suggests on its facts that the notice is dispositive because of what the customer knew in the primary market relative to the notice that was given and relevant to the rest of the factors that might be in play in Kodak, because notice doesn't mean that you can dispose of high switching costs, lack of information costs, unless you have a record that establishes that the customers actually understood the notice that way and therefore responded accordingly. So wait, your CEO did. Well, let me focus on this for a minute on this record, because this is a very important point here. There's no support for this instruction in this record because there isn't any evidence that there was this clarion call in 2008 with this notice. Start with the evidence. Well, you've just had one piece put in front of you. You've heard Mr. Waxman talk about it. You heard Judge Hardman note it. Tell us about your client's CEO state. He was not a customer, Your Honor. The issue here is customers in the primary market. Is that not indicative of understanding and knowledge in the market, your own CEO's admissions? It certainly could be, but I'm not even sure it's relevant to it, because he wasn't a contracting party. His understanding of the contract didn't matter as a matter of law, and the issue after all is customers. What did they know? How did they behave? And back to the point you made earlier, Your Honor, that's a factual inquiry. Just as the court suggested. We're not making points here, Mr. Martin. I'm just trying to ask questions. What does the evidence say about what the customers knew post-08? Nothing. I exaggerate, but only a bit. There was one 08 contract in evidence from 3M. Now, if we're talking about notice relative to that contract, if the 3M customer said, I'm going to use an independent service provider, mainly TLIC. So if the contract had this clarion notice provision in it, it certainly didn't affect the only customer who testified. So is your argument, Mr. Martin, that this whole 08 line of temporal demarcation is a red herring, that really the great mass of evidence is pre-08 and that the verdict just stands because of that, even if the court were to disagree with you regarding the import of the change that occurred in 08? Yes, I would agree with all of that. How do we do that? Assume that we disagree with you on the import of the 08 change. How does the verdict survive? Okay, so a couple more things just on the factual record on 08. None of the contracts are in evidence. There's no testimony from customers that those contracts were regularly used. There's evidence in the record that they were not regularly used. So for an instruction not supported by the evidence, it would be reversible error to give it. Where else did they go for the notice? When you say there's nothing in the record, there certainly is record. I mean, there are 08 contracts in the record, right? One contract. Right. And the character of the market is amply represented in the record, right, that these are sophisticated buyers, well-represented, making large ticket purchases. But then we'd have to take two other steps, that that 08 contract was, in fact, regularly used, and second, that it was understood by the customers to be a disclairing call. But a jury could do that. Are you saying it's outside the bounds of rationality for a juror to have looked at that? No, I'm saying actually it was a jury issue, and it was a jury issue in this case. It was argued in this case. If that's a jury issue in this case, then how can it be that you can say the verdict survives? Because we're talking about, Your Honor, a claim of instructional error for an instruction that was not given that made notice mandatory or that made the effect of notice mandatory in directing the jury on the verdict. That's a very different question from whether or not the instructions in this case allowed the jury to consider that issue, which they did. Sure, but if they didn't instruct, even if it's not, even if we were to not accept the argument that the law is that the clear notice eliminates an aftermarket as a matter of law. If the failure to instruct the jury about the weight or the importance of notice on whether or not there is an aftermarket, I mean the assertion is made that this was just all thrown at the jury and put in their lap, with no guidance at all on how to weigh in. I guess what I'm trying to ask, Mr. Martin, is even if we were to reject the idea that it's clear as a matter of law that notice prevents an aftermarket, shouldn't a jury know that that's at least a highly salient factor, which is something that a plaintiff ought to be expected to come forward with serious evidence to overcome? Not just that it's one of five things you can throw in a grab bag and think about. Well, I would say two things. First of all, if we look at the instructions in this case, it allowed the jury to traverse a path and evaluate the significance of that notice in the manner that the court has suggested. What the instructions didn't do was give... Help me with that. When you say, because now you're taking issue with their assertion that these were just five factors, given to them, weigh them as you want, what are you pointing to? Because they point the language in the instructions on that. What are you pointing to in the instructions that gives more guidance than that and instructs the jury about... So the instructions that dealt both with liability, which the court can find at JA620, and the instructions that applied to damages, which deal directly with this point. The first is that the jury was instructed to evaluate the lawfulness and unlawfulness of the conduct as it related to different time periods. The second thing was the jury was told that the effect of any proof that PBX customers could not have expected to hire ISPs was relevant to the liability calculus. Then the jury was told, specifically, that it couldn't award damages where it found the conduct was lawful, it could only award damages for unlawful conduct, and further, that if the jury couldn't sort between the two, and that is a portion, then it couldn't award damages at all. So the jury was given much more specific direction here than just the five factors. And on the factors, it was specifically told that we had to provide evidence for all of them in order to get the jury's consideration for this, and that they, if they disproved one of them, the jury could go against them. So under the controlling law, the jury had what it needed in order to make this determination, and Avaya had the platform to argue it, Your Honor, which it did. Can I answer, Mr. Martin, a question which shifts slightly to, well, shifts a lot to a different topic. As we talk about whether the jury verdict can stand or not, of course, the decision by the district judge to grant judgment as a matter of law after two months of trial, you know, it struck me as you sat through it, yeah, that's a pretty remarkable thing to do. And your opposing counsel there make much in the briefing of how that infected even consideration of the antitrust rulings. Would you agree that if that JMO was improbably or incorrectly granted, that that undermines the entire verdict? I would disagree with that. I'm sure that, again, comes as no surprise. But how do you say the verdict on your antitrust counterclaims if it was incorrect for the court to take the common law claims away and to tell the jury they couldn't even think about those claims in the context of the behavior between the parties? So, first of all, looking at the antitrust claims themselves and focusing on the period pre-2008, there was evidence in the record to substantiate all of the antitrust claims and the full award of damages pre-2008. And so the first place to start is that the presumptions in favor of the verdict substantiate that the $20 million properly could have been awarded on the evidence that was admissible, supported by damage evidence that came in. Can you respond to their assertion, which I'm not hearing so far, but I might just be missing it. Their assertion, as I understand it from the briefing, is the judge instructed that jury, don't consider any of the back-and-forth behavior that the Avaya folks accused TLIC of engaging in. Don't let that enter your mind when you consider their behavior in the market. In other words, it wasn't a natural or a lawful response to unlawful actions by the TLIC people. So that means the antitrust verdict is tainted. So the reason I started with the antitrust verdict and the fact that on this record, the presumptions in favor of the evidence, the damages, and the verdicts, is that this now has to be a claim of prejudicial error to overturn a verdict that was fully supported and can be affirmed. Now, as to Avaya's making this argument, if you look in the opening brief, it isn't more than a single sentence, and it's not developed, this prejudicial taint argument. Second, despite the assertion that it's well- So you're saying they waived it? I am saying they waived it, Your Honor. And the reason that I'm saying that is because a claim of prejudicial error, which this court's case in Hurley says applies to any argument, no matter how intuitively strong it might be, requires a development of how it would have been different. And we were entitled to know that before we wrote our brief. The only reason, actually, that this argument is developed by us at all is that we responded to it despite the fact that they didn't make it. Okay, so assume just for the sake of discussion we didn't think it was waived. What's your response? So turning to the lawfulness instruction that the court focused on, that was only one small instruction in a package of broader instructions. It was separated from the liability instructions, and it was not as all-encompassing as the court described it. There were two pieces to it. The first was that the jury was told that a vias state law claims had been resolved. Now, as we pointed out in our briefing, that certainly did us no favors because resolved didn't say rejected. It didn't say dismissed. And for practical purposes, the front half of that jury instruction was as consistent with them being right as us being wrong. The second half of the instruction was very narrow, and it wasn't directed at a vias conduct at all. It was directed at TNOIC's conduct as it related to using the ODMC's, and all it said in a single sentence was that conduct was lawful. Now, when we pivot over to the antitrust issues, which was the source of Your Honor's questions, that's not the issue on the antitrust claims. The issue on the antitrust claims was a via's intent. Did a via have pro-competitive intent when it acted the way it did throughout this case? We submit the answer to that as no. But looking at the FUD letters specifically, which became the focus of this, they got to make the argument without objection, uninhibited, that those FUD letters were sent for pro-competitive reasons. That issue went to the jury, and the jury rejected it. Are you saying that the fear and loathing letters, the FUD letters, could properly be assessed by the jury after being told by the court, don't look at the TLIC piece of this? Maybe I'm being too simplistic, but that's kind of what I understand. They'll get up and they'll tell me if I'm wrong. But I get their argument to be, there's two sides to this fight, and if the judge says, don't pay any attention to the punches being thrown over here, just look there, you don't have a fair assessment going on in the jury room, including an assessment of the FUD letters. Your Honor, again, to refocus the inquiry, first of all, the instruction didn't go that far. Second of all, it's pure speculation on their part that it would have overcome the rest of the proper instructions that the jury received. And third, in terms of pro-competitive intent, which was the crucial issue, Avaya was able to argue that without objection. And not only that, not only is it kind of misdirection in terms of what the jury was specifically asked to consider on the core issue, but it didn't materially inhibit Avaya from arguing TLIC's anti-competitive intent in any respect. They got to do it. And I would also add... Did they really argue TLI had anti-competitive intent? My reading of the record was that Linda Schumacher gives this in spades. She said, we're just enforcing our rights. We're just enforcing our rights. These people are running around like wildcats, and they're doing head runs around the rules. And we're just enforcing the rules. Isn't that what their argument was? I made a poor word choice. What I meant was this instruction came up after Avaya had been able to make its full argument on the tort claims concerning TLIC's conduct and why TLIC's conduct, in fact, entitled it to a business justification defense under the antitrust laws, which included all of the conduct that we are accused of engaging in relative to the other factors that were, you know, the fraud in the... I'm sorry, not the fraud, but relative to the conduct that was engaged in that didn't relate to the access to the passwords specifically. And, of course, they had more conduct, and the jury heard that. So that, as I hear you saying, this all came in anyway, but what they weren't allowed to tell the jury was that your client's behavior was tortious, fraudulent, et cetera. Is that the argument? They all came in, but they weren't allowed to characterize it as legally actionable? Well, not in the final argument, but they had certainly done it up to that point, and the jury heard it as it related to the state law claims and had it in front of it as it related to the antitrust claims. How were they able to do it, just through the testimony of the witnesses that they proffered? And the instructions that were given, which allowed the jury to evaluate Avaya's business justification defense for what it did. And we're talking about prejudicial error here. Isolating those flood letters as a path to reversal of this verdict at the end of the day, also based on this instruction that they're over-reading and speculating about, would be an injustice of the first order. That was not the only evidence in this case as it related to their anti-competitive conduct. Well, it's a little like saying if you've got a drop of poison in a bucket of water, it's unfair because so much of that water is pure. If they are correct that it poisoned the water, how is it an injustice of the first order to say, go back and do it again, and this time make sure you don't poison it? I would put that slightly differently, Your Honor, in terms of the way the error should be looked at. And the way I would say it is this. You have to have in front of you a compelling record that demonstrates that by virtue of the giving of that instruction alone, a different result would have been, or the absence of that instruction, or the presence of the state law claims, a different result would have been reached. And back to where I started here. We have a fully supported set of antitrust claims that exist independently with different defenses supported by the evidence. And the notion that this one instruction or the absence of those state law claims interfered with that verdict is not or would have led to a different result, particularly where those claims aren't supported. The judge was right. I can't get you to error. Are those antitrust claims or verdicts consistent? One of the things that I was wondering about, Mr. Martin, was you've got the jury saying there was a liability for attempted monopolization, but not for monopolization, right? And I'm wondering if the antitrust aftermarket required some kind of lock-in and advantage, heavy advantage in the aftermarket, does that require monopolization? In other words, can you have these two things at the same time? You didn't actually succeed in monopolizing, oh, but you did have an illegal tie in an aftermarket. So I would say two things. First of all, that argument isn't being advanced as a reason to reverse this verdict. No, but I'm asking you. And second, I don't know how I understand that. I just want to make sure that that's clear. Second, the verdict is consistent with attempted monopolization, which is what the jury found on. And in terms of the relevant presumptions that apply to this court's review, you look at the evidence. If it substantiates that prong of the jury's verdict, then you affirm. You don't look to maybe it's one of the things I feel like we're responsible for is to not, and you picked this up in some of the case laws, is to not allow things to move forward on an economically irrational basis. That's why I'm asking this question, okay? For there to be an effective tie in an aftermarket, does there have to be effective monopolization? Can you have an attempted monopolization but no monopolization and still have an illegal tie in the aftermarket? That's just as a matter of logic. Help me with that. I think you can as a matter of law, and as far as the logic is concerned, if the tie itself is viewed as an anti-competitive act in support of the attempted monopoly claim, then I think you can have both consistently. It's an anti-competitive act in an otherwise competitive market. That's your point? Well, it's an anti-competitive act under Kodak, which sent both claims to the jury and said that became a jury issue. We have a jury verdict that can be read consistently with both claims, and that's seemingly where we should end up, because there's no argument being made here that some fundamental inconsistency in the verdict, as a matter of practical logic or law, compels a reversal. So this is, in that sense, the functional equivalent of Kodak, and Kodak didn't start sorting between what claims the jury would ultimately find on, and we evaluate jury verdicts by looking at whether the claims that they did find on are supported, which these are. You mentioned inconsistency a moment ago. Isn't the district court's Noah Pennington ruling inconsistent with the prejudgment interest ruling? Well, two things there. First of all, it could be viewed that way, but, again, in terms of evaluating the verdict, it need not be. The legal standards between the two are different, very different, although the conduct which supports each can be the same. Well, if you look at the three factors on the Clayton Act, besides the fact that everybody seems to concede that there are no cases out there, I'm looking at the record and I'm saying, what is the conduct that Avaya has engaged in that TLIC hasn't engaged in? It seems like, you know, whatever the relative size, and, you know, the court made a determination that Avaya seemed to have more to gain by delay, which I'll just put aside for a moment, but everybody seems to be engaging in the same conduct. You know, the motions are going, are flying each way. It's a very hotly contested litigation. I'm at a loss to figure out what is the factors that are met, the three factors that I see under the Clayton Act that I don't think are met. What is it that the district court was hanging its hat on to on the one hand say, yes, there should be prejudgment interest, but on the other hand say, no, there should be no opinions? The proper focus of the inquiry for validating the verdict or the decision that the judge made is on whether the evidence supports the prejudgment interest statutory factors. And as we've demonstrated in our brief, Avaya's abusive litigation tactics on the one hand and the delay for purposes of cost on the other fit the purposes of the Sherman Act section perfectly according to congressional intent. As far as the sham exception was concerned, the judge found an independent reason, which we think is erroneous, but was that those facts bundled together did not fit. The sham exception and so rejected that. To me, the rejection of the sham exception, while we think it was erroneous, doesn't compel or suggest that the judge's findings and independent findings under the Sherman Act statute were not properly in place. Mr. Martin, we have not addressed the predictive dialing system, PDS. Since we're short on time, let me cut right to the chase. Prior to 07, there appeared to be no coercion. They were handing out the patches to everybody, and I have trouble ascertaining how after 07 that there's a cognizable aftermarket. How am I wrong? The issue before 07 is not whether they were freely available, but was there coercion and threats that forced customers or had customers taking the patches and taking the vias, more importantly, maintenance along with the patches, because the maintenance ends up being the critical issue. Notwithstanding that they might have been available for free, the record testimony establishes that the customers were indeed coerced pre-207 and post-207. Can you give us some citations for that? Let me do my best. They're in the brief, but let me have a quick note on that. I do have that information. If you give me two seconds, Your Honor, I apologize. As to the policies pre-2007, I would point the court to the testimony from Alan Mann, JA6945, witness testimony at 3156, 3202-06, 3268, and customers who testified they were concerned about the policy at 3177 and 7298. Finally, if we want to know if customers moved as a result of the threats pre-2007, I would point the court to JA3210, JA3403, and JA3412. Now, as to after 2007, we have a very powerful record there as well, illustrated most specifically by SunTrust, who went from the- I thought that really hurt you. No, Your Honor. Actually, it's not just Mr. Waxman. I mean, SunTrust, my recollection of the testimony, you'll steer me right if I'm misremembering it, is that SunTrust surveyed the whole landscape. They were told what the deal was after 2007. By the way, this is the only client to testify, as I recall, after 2007, right? But there was evidence about other 2007 issues. And the SunTrust, at the end of the day, they say, yeah, we looked at all this and we chose ARIA. So that isn't actually what happened. They wanted to use TLIC and had selected TLIC and switched to ARIA because of the coercion from the patches when they went to get the maintenance upgrade after 2008. So it's a perfect illustration of it. In addition, there were two other customers in the record who also were post-2007, and all of that evidence is sufficient under the Portner case to meet the minimus threshold. Now, let me provide some record sites there, too, if I can, Your Honor. As to how this all unfolded, JA 3172 to 3173, 3177 to 3181, and 3184. As to SunTrust wanting a TLIC before Avaya stepped in, look at 3169 to 3174. And finally, as to the customers and the results of it and SunTrust saying, we didn't go because we ultimately settled on Avaya, take a look at 3172 to 3181, 3251. And finally, 3121 to 3123. And I think what you'll see there, Your Honor, is that there is full substantiation for tying claims in both those time periods. Now, as to the disaggregation claim that follows that, which is their argument, that's also waived. They never asked for any kind of a jury verdict that split this up. And, of course, as I've said, the evidence substantiates it. So there's nowhere to go with this PDS argument anyway. Thank you. Great. Thanks very much, Mr. Martin. Mr. Rafferty, are you available? Thank you. I guess I'll address my friend's points in the reverse order, talking first about the anti-competitive conduct and then the affirmative claims and the harm to our antitrust case, and then ending where he began and where you all began, which is, again, back to the aftermarket. Our submission is, both with respect to the PBX attempted monopolization and the PDS tie, that we're entitled to judgment as a matter of law because there is no anti-competitive conduct that was properly demonstrated. With respect to the PBX, they have hung their hats on two of the weakest theories of Sherman Act conduct, that is, unlawful refusal to deal and so-called fraud letters. And their evidence absolutely fails to establish the predicates of both. That is, with respect to unlawful refusal to deal, they absolutely had to prove that we reverse a years-long practice of dealing with rivals, where, in fact, we had never, ever dealt with a rival. And second of all, they had to prove that we did so, sacrificing short-term profits in order to get a long-term gain by eliminating rivals. And they certainly didn't do that. Your Honor, Judge Hardiman asked about the $12 million to $18 million of maintenance business loss. They say, well, they obviously sacrificed short-term profits because we had sold $5 million worth of Avaya equipment. But the fact that we would no longer have them as a business partner in no way suggests that people who wanted to buy Avaya equipment wouldn't have bought it from Avaya or one of the many other business partners. And in any event, the evidence showed that we reasonably believed that we would lose at least $12 million per year of very high-margin maintenance business. We terminated our contract with them in order to preserve our short-term profits, which is exactly what consumers do. Is there another component, though? I thought that jury instruction was in the disjunctive. It said short-term profits or, and I apologize. I'm forgetting what the or was and hoping maybe you remember it. I think there are two. I don't remember the instruction myself either. We don't have a claim of instructional error on refusal to deal. Under Trinco and Pacific Bell versus Linkline, it is absolutely clear that in order to establish the rare instance in which refusal to deal with a rival violates the antitrust laws, you have to prove that there was an evulsive change in a years-long practice of dealing with rivals. That's the Aspen skiing case. And you have to prove that it was done so to, that doing so sacrificed short-term profits at the expense of a long-term gain. They didn't prove either. But that's, just to be clear, you're not challenged. And of all the many things that are challenged here, this is not being challenged, right? The jury verdict, I mean, the jury instruction about this. Correct. Okay. Our submission just is that they failed to prove. You think they failed to prove it. Okay. But the instruction was in the disjunctive. If I'm remembering that right, even if they didn't prove that you were acting against your short-term interest, but they proved that other thing after the or, they should win, right? Well, no, no, no. Whether the instruction was correct or not, whether we've assigned an error in this appeal or not, it is black-letter Sherman Act law that it doesn't violate the Sherman Act to refuse to deal with a rival unless you've had a year's long practice of doing so and, and if and, you also sacrifice short-term profits for a long-term gain. And with respect to FUD, and I'll get to the instructional question in just a minute, they had to prove that those letters were both clearly false and that they had no opportunity for remediation. And they didn't prove either. The, for reasons I, I won't waste the court's time. Right, we've got the brief. Yes. On, on, with respect to the affirmative claims, this is what the judge instructed the jury. Quote, you, TLI's use of and access to Avaya's maintenance software may not be considered by you to be unlawful. And at page, I've forgotten which page of our reply brief, we explain that not only was there an instruction, but the judge repeatedly refused to allow us to cross-examine their CEO, cross-examine their expert, with any inference whatsoever that would suggest that what they were doing affirmatively was in fact inappropriate. So we were substantially. Inappropriate or illegal? In other words, what the judge. Clearly he never stopped you from saying it was illegal, but I, I thought there was a lot in the record about how inappropriate it was. Well, I, I, I commend the court to the citations in our yellow brief. And the fact of the matter is that the judge's instruction to them was tantamount to telling them that our so-called FUD letters. Right. Were indeed false. Now, finally, as to the aftermarket. Judge Jordan, you were making the point about sort of economic common sense. The relevant question is whether or not competition in the primary market is disciplining pricing in the aftermarket. And it is a matter of utter common sense that if you have a highly competitive primary market, and if customers in the primary market, if reasonably diligent customers in the primary market have no reason to believe that they can, in fact, get Avaya software with the use of an unauthorized independent service provider, just as a matter of Sherman Act and economic common sense, there is discipline. That's this court's en banc decision in town sound. Now, Judge Hardiman, you asked the question, well, weren't the post-08 contract, weren't there only a few contracts and wasn't that only a small amount of what was really going on? It wouldn't matter even if it were true, but their damages expert testified the percentage of the damage award that he calculated, the damages that he calculated attributable to post-2008 contracts was very, very substantial. And we give the relevant site in our brief. As to what customers understood after 2008, first of all, Diane Martin testified that the 3M contract was the form contract. Mr. Waxman, I think we've got the briefing on that, and our time is far spent. If there's any other thing you want to tell us, please go ahead. I just wanted to say that it is, with respect to these instructional errors, it is their burden to show that the error was, that this was harmless error, not our burden to show that there was, in some miniscule respect, they harmed us. And finally, on the affirmative, the waiver claim, I'd cite the court to, in our blue brief, pages 4, 43, and 68, where we address these failover questions. Thank you. I'll ask the parties, if you wouldn't get together and please provide us with a transcript of today's argument. I want to note, as you all know, the passing of Judge Arenas, who marched this road with the parties for an awful long time. I noted, with some sadness, his comment in the record during the argument on post-trial motions, that he hoped he'd live long enough to hear what the circuit is going to say about this. That's a quote. I wish he had to. I kind of hope I live that long myself. All right. Thanks very much. We appreciate the arguments, and we'll take the matter under advisement.